# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

KAREN RODRIGUEZ,          :
    Plaintiff,            :
                           :    CIVIL ACTION NO.
v.                       :
                           :
NANCY A. BERRYHILL,      :    16-CV-1494 (VLB)
ACTING COMMISSIONER OF  :
SOCIAL SECURITY,        :    April 5, 2018
    Defendant.          :

## MEMORANDUM OF DECISION DENYING DEFENDANT'S MOTION FOR ORDER REVERSING THE COMMISSIONER'S DECISION [DKT. NO. 16]

This is an administrative appeal following the denial of the Plaintiff, Karen Rodriguez's, application for Title II Social Security Disability benefits, and a Title XVI application for Supplemental Security Income.[1] It is brought pursuant to 42 U.S.C. §§ 405(g). Karen Rodriguez ("Plaintiff" or "Rodriguez") has moved for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"), or remanding the case for rehearing. [Dkt. No. 16]. The Commissioner opposes this motion. [Dkt. No. 20]. On July 13, 2017, the

---

1 Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). C.F.R. §§ 404.929 et seq. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. 20 C.F.R. §§ 404.967 et seq. If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

case was fully briefed.  For the following reasons, Rodriguez's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 16] is DENIED.

I.  <u>Background</u>

A.  <u>Administrative Proceedings</u>

Plaintiff applied for disability insurance benefits and supplemental security income in June 2013.  [AR 222-32].  She alleged that she became disabled on January 1, 2011, at age 33, due to panic attacks, insomnia, anxiety, depression, agoraphobia, a personality disorder, and asthma.  [AR 279].  Her applications were denied initially and on reconsideration.  [AR 126-29, 131-33].  She then requested a hearing before an ALJ.  [AR 144-45].  After a hearing, at which Plaintiff was represented by counsel, Administrative Law Judge ("ALJ") John Noel issued a decision on August 20, 2015, finding that Plaintiff was not disabled under the Social Security Act (the "Act").  [AR 19-29].  The Appeals Council denied Plaintiff's request for review, and this action followed.  [AR 1-3].

B.  <u>Medical History</u>

On appeal before this Court, Plaintiff highlights the following medical conditions:  (1) anxiety and depression; (2) right knee impairment; (3) cognitive deficiencies; and (4) obesity.

1.  <u>Anxiety and Depression</u>

Plaintiff received mental health treatment from therapists and a psychiatrist at Franciscan Life Center from October 2011 through December 2014. Specifically, Plaintiff received mental health care from psychiatrist Dr. Joanna

2

Jakubowska, MD, and from mental health counselors Sister Sophia Peters, MF-T, and Sister John Mary Sullivan, LMFT. [AR 389-411, 436-447, 480-82]. In notes from an October 24, 2011 visit, Peters noted that Plaintiff had moved from the Bronx, NY to Connecticut, and that she had previously been diagnosed with anxiety and depression. Peters stated that Plaintiff was taking 60mg of Cymbalta every day. Peters' notes also stated "ER often for anxiety." Peters found that Plaintiff had a Global Assessment of Function of 55 and recommended weekly therapy sessions with medication management. [AR 389-92]. Peters also observed that Plaintiff was well-groomed and calm, that she had an appropriate affect and a normal mood, that her thought process was intact and she had no hallucinations, and that she was fully oriented and her memory, cognitive functioning, capacity for abstract thought, judgment, and insight were intact. [AR at 390]. Peters recommended weekly therapy and medication management. [AR 392].

On November 7, 2011, approximately two weeks after Peters' notations, Plaintiff presented to Dr. Jacubowska for a psychiatric evaluation. Dr. Jacubowska noted symptoms associated with plaintiff's diagnoses, including anxiety, panic attacks, poor concentration, poor sleep, and fear of social situations. Dr. Jacubowska diagnosed Plaintiff with panic disorder with agoraphobia and entertained possible diagnoses or "ruling out" of major depressive disorder and bipolar disorder. [AR 393-94]. Plaintiff noted that her energy and motivation were good, and Dr. Jacubowska observed that Plaintiff was well-groomed and alert and oriented to person, time and place. [AR 394].

Plaintiff's speech was normal in rate, volume, and tone, and her affect was constructed with no lability and her mood was euthymic. [AR 394]. Plaintiff's memory was intact, but her concentration was poor, and Plaintiff denied hallucinations. Plaintiff's thought process was logical and goal directed, and Plaintiff had fair insight and good judgment. [AR 394]. Dr. Jacubowska advised Plaintiff to continue her current medication regimen, which included Trazodone and Cymbalta. [AR 393-94]. In a follow-up appointment on November 28, 2011, Dr. Jacubowska noted that despite treatment, Plaintiff experienced no changes in her symptoms. [AR 395].

Plaintiff saw Peters weekly from November 28, 2011 to January 6, 2012. [AR 396-97]. On January 6, 2012, Plaintiff reported that she felt "stronger." [AR 396]. The session focused on Plaintiff's goals and the possibility of getting a general education diploma ("GED"). Peters also explained that she was leaving the Franciscan Center and that Plaintiff would be transferred to a different therapist. [AR 396].

Beginning on January 20, 2013, Plaintiff began seeing Sullivan, and she continued see Dr. Jacubowska for medication management. [AR 397]. On March 28, 2012, Sullivan noted that Plaintiff reported she "continue[d] to struggle" with anxiety and depression and had been unable to implement any relaxation techniques. Sullivan reviewed relaxation techniques with Plaintiff and instructed her to utilize these techniques when experiencing symptoms. [AR 395]. On a follow-up appointment on April 24, 2012, Sullivan stated that Plaintiff reported that she was struggling with sleep problems and was "unable to sleep through

the night due to anxiety." [AR 397]. In a treatment note dated April 25, 2012, Jacubowska noted that she was going to discontinue prescribing Buspar to Plaintiff due to lack of benefits but would continue to prescribe Cymbalta. She also noted that Plaintiff had complaints of mood changes, racing thoughts, irritability and fear/paranoia. [AR 398].

In her May 11, 2012 treatment notes, Dr. Jacubowska stated that Plaintiff continued to complain of racing thoughts and poor sleep, and Dr. Jacubowska prescribed Abilify to treat these symptoms. [AR 398]. In her June 7, 2012 treatment notes, Dr. Jacubowska stated that Plaintiff's dosage of Abilify would be increased and that Plaintiff continued to suffer from anxiety and poor sleep.

Plaintiff's mental health treaters' notes from December 12, 2012 through November 21, 2013 state that during this period of time, Plaintiff continued to suffer from symptoms of anxiety, depression, agoraphobia, and panic attacks. [AR 401-410]. On October 29, 2013, Sullivan completed a Mental Impairment Questionnaire. This questionnaire is co-signed by Dr. Jacubowska. Sullivan stated that Plaintiff had a diagnosis of panic disorder with agoraphobia and major depressive disorder. Sullivan noted that Plaintiff was taking the following medications: Celexa, Lemictal, Klonopin, and Abilify, all of which are used to treat anxiety and depression. Positive clinical findings included poor concentration, auditory halluciations, paranoia, depressed mood, and constricted affect. Plaintiff's judgment and insight were rated "fair," Plaintiff was well groomed, and under "cognitive status," Sullivan noted that Plaintiff was oriented to person, place, and time, her memory was intact, her attention was fair, and her

concentration was poor.  Sullivan noted that Plaintiff had a slight problem in carrying out single-step instructions and changing from one simple task to another.  [AR 385].  Sullivan stated that Plaintiff would have an "obvious problem" with respect to:  (1) using appropriate coping skills to meet ordinary demands of a work environment; (2) handling frustration appropriately; (3) interacting appropriately with others in a work environment; (4) asking question or requesting assistance; (5) getting along with others without distracting them or exhibiting behavioral extremes; (6) carrying out multi-step instructions; (7) focusing long enough to finish assigned simple activities or tasks; (8) performing basic work activities at a reasonable pace/finishing on time; and (9) performing work activity on a sustained basis.  [AR 382-86].

On November 12, 2013, Plaintiff told Dr. Jacubowska that she was doing well.  [AR 409, 436].  Plaintiff's sleep had improved with an increase in Klonopin and she denied having a depressed mood.  [AR 409].  Dr. Jacubowska found that Plaintiff was alert and oriented to person, place, and time, that Plaintiff's mood was normal and that Plaintiff's affect was constricted but with no lability.  [AR 409, 436].  Plaintiff did not hallucinate, and her judgment and insight were good.

On January 22, 2014, Dr. Jacubowska completed a Medical Report for Incapacity for the State of Connecticut's Department of Social Services.  Dr. Jacubowska states that Plaintiff had been diagnosed with panic disorder with agoraphobia and bipolar I disorder.  Dr. Jacubowska opined that Plaintiff experiences panic attacks, poor sleep, inability to focus, high anxiety, and poor concentration.  She added that Plaintiff "continues to have a fear of social

settings.  [AR 411-415].  On the form, Jacubowska marked a box indicating that Plaintiff could not work while she was being treated.  [AR 413].

Plaintiff continued treatment with Sullivan and Dr. Jacubowska throughout 2014.  [AR 438-47, 481].  In January 2014, Plaintiff reported that she had more anxiety during the holidays and felt overwhelmed by her responsibilities.  [AR 440].  Dr. Jacubowska found that Plaintiff was oriented to person, place, and time, Plaintiff's mood was normal and her affect was constricted, but she exhibited no lability.  [AR 440].  Plaintiff did not have hallucinations and her judgment and insight were good.  [AR 440].  Dr. Jacubowska noted that Plaintiff's mood was stable and her anxiety had increased in the context of recent stressors.  [AR 440].  She recommended that Plaintiff continue therapy and her current medications, and she reported the same findings during subsequent evaluations, except in December 2014.

On that date, Dr. Jacubowska observed that Plaintiff's affect was bright instead of constricted, and Plaintiff reported that she was doing well.  [AR 440-41, 444-47].  Dr. Jacubowska also saw Plaintiff in January, March, and April 2015, at which point Dr. Jacubowska found that Plaintiff was alert and oriented to person, place, and time, her mood was dysphoric, her affect was constricted, she had no lability or hallucinations, and her judgment and insight were good.  [AR 481-82].

2. Right Knee Impairment

On September 18, 2012, Plaintiff went to Dr. Malisa L. Lahtinen, MD with complaints of right knee pain when sitting or standing for too long.  Dr. Lahtinen evaluated the right knee condition and ordered imaging of the right knee.  [AR

360, 365].  Dr. Lahtinen found that Plaintiff had full range of motion and full strength of her right knee with mild tenderness to percussion.  [AR 365].  X-rays of Plaintiff's right knee taken on October 11, 2012 showed no acute abnormality.  [AR 360].  An MRI of Plaintiff's knee taken January 11, 2013 revealed mild degenerative changes, posterior medial meniscal horn mucinous degeneration, ganglion cyst within the posterior knee, and an asymmetric signal within the midline tibial plateau underlying the tibia spines.  [AR 361-62].  Plaintiff presented to Kavita R. Patel, APRN from Comprehensive Orthopedic and Musculoskeletal Care LLC on April 1, 2013 with complaints of increased pain in the right knee, which was exacerbated by any type of activity.  Ms. Patel evaluated the right knee contusion and sprain and instructed the Plaintiff to attend physical therapy.  [AR 378-79].

From May 1, 2013 to July 10, 2013, Plaintiff attended physical therapy sessions for her right knee condition at the Easter Seals Rehabilitation Center.  [AR 449-71].  Plaintiff's attendance was sporadic, and she ultimately attended only four of 13 appointments.  Despite inconsistent attendance, in June 20, 2013 discharge papers, physical therapist Katherine Sullivan stated that Plaintiff's pain decreased, she had increased strength and range of motion in her right hip and knee and she had less difficulty walking.  [AR 456].  Plaintiff reported difficulty running, but she did not have difficulty performing typical daily activities.  [AR 460, 462].

Plaintiff saw Dr. Lahtinen for a complete physical examination in May 2013, and observed that Plaintiff was in no acute distress, and that Plaintiff's exhibited

no edema of her extremities. [AR 367]. Musculoskeletal examination revealed no gross deformity, normal range of motion, and normal muscle strength. [AR 367]. Neurological examination revealed no abnormalities and showed active and equal reflexes of the knees, normal motor function, and intact sensation. [AR 367].

Dr. Lahtinen completed a "Disability Impairment Questionnaire" on March 6, 2015. [AR 543-47]. Dr. Lahtinen stated that she saw Plaintiff once per year, having first seen Plaintiff on April 30, 2012 and most recently on October 24, 2013. Dr. Lahtinen declined to provide an assessment of Plaintiff's physical ability to work, and she deferred to the psychiatrist with respect to questions related to Plaintiff's mental functioning.

### 3. Cognitive Deficiencies

On June 11, 2015, psychologist Dr. Marc Hillbrand, PhD conducted a psychological evaluation of the Plaintiff on behalf of the State Disability Determination Services. [AR493-96]. Plaintiff reported that she had anxiety since childhood. [AR 493]. She said that she experienced panic attacks since age twenty, after her father committed homicide and suicide. [AR 493]. Regarding Plaintiff's activities of daily living, Plaintiff was independent in her personal hygiene and she performed household chores, managed her finances, and maintained a social support network consisting mainly of her family. [AR 494]. Dr. Hillbrand observed that Plaintiff had good hygiene and that she appeared quite anxious. [AR 493-94]. He found that Plaintiff was alert and oriented to person, place, and time. [AR 494]. Plaintiff's attention, concentration, and short-term memory were "roughly commensurate with her native intellectual

endowment." [AR 494]. Plaintiff's speech articulation was normal, she was fluent in English and Spanish, and she spoke without an accent. [AR 494]. Her speech volume was average and her speech content was appropriately varied. [AR 494]. Plaintiff's thought process was concrete ad she reported no perceptual abnormalities. [AR 494]. Dr. Hillbrand found no evidence of cyclic mood disorder or psychotic disorder. [AR 494].

During this evaluation, Dr. Hillbrand administered an intelligence test using the "Wechsler Adult Intelligence Scale—Fourth Edition." [AR 493-96]. Dr. Hillbrand conduct a mental status examination of the Plaintiff which revealed that she "appear[ed] quite anxious" and that her "motor behavior is suggestive of anxiety." [AR 493-94]. Plaintiff's mental status examination also revealed that "[h]er verbal reasoning abilities are very poor, including judgment." [AR 494]. On the Wechsler Adult Intelligence Scale—Fourth Edition, Plaintiff achieved the following scores: Verbal Comprehension Index, 58; Perceptual Reasoning Index, 65; Working Memory Index 66; Processing Speed Index 59, and Full Scale IQ 56. Dr. Hillbrand stated that Plaintiff's high anxiety level likely had an overall 'depressing effect' on many of her test scores." [AR 495].

Dr. Hillbrand diagnosed panic disorder with agoraphobia; post-traumatic stress disorder, chronic; cognitive disorder, not otherwise specified; and borderline intellectual functioning. [AR 496]. Dr. Hillbrand believed that Plaintiff functioned in the borderline intelligence range, and that her anxiety level further limited her cognitive resources. [AR 496]. Dr. Hillbrand stated that Plaintiff is capable of managing benefits. [AR 496].

4. **Obesity**

Dr. Lahtinen indicated that Plaintiff was obese at a height of 65.25 inches and a weight of 227.4 pounds in April 2012, which is consistent with a body mass index of 37.55 and with obesity.  [AR 22].  Plaintiff visited Lahtinen on April 30, 2012 and May 3, 2013 for comprehensive physical examinations.  [AR 363-64, 367-68].  Dr. Lahtinen noted Plaintiff's history of anxiety and depression and her treatment with Dr. Jacubowska and Sullivan.  At these examinations, Dr. Lahtinen found that Plaintiff was in no acute distress [AR 363, 367].  Dr. Lahtinen also observed that Plaintiff had normal hygiene and grooming.  [AR 363, 367].  Plaintiff was alert and oriented to person, time, and place and her eye contact was appropriate.  Plaintiff's mood was normal.  [AR 363, 367].

C. **The ALJ's Decision**

At step one the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date.  [AR 21].  At step two, the ALJ found that Plaintiff had severe impairments by virtue of her diagnoses for depression and anxiety, holding that "[t]hese impairments have a more than minimal effect o[n] the claimant's ability to perform basic work activities."  [AR 22].  The ALJ also found that Plaintiff's obesity and asthma were non-severe impairments, finding that "[t]reatment records revealed that her physical examinations were essentially normal."  [AR 22].

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d),

416.925 and 416.926.  Specifically, the ALJ found that the severity of Plaintiff's

mental impairments did not meet or medically equal the "paragraph B" criteria of

listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and

obsessive compulsive disorders), which require the Plaintiff to show at least two

of the following:  marked restriction of activities of daily living; marked difficulties

in maintaining social functioning; marked difficulties in maintaining

concentration, persistence, or pace; or repeated episodes of decompensation,

each of extended duration.  [AR 22].  The ALJ found that Plaintiff had only a mild

restriction in the activities of daily living, because Plaintiff was independent in

personal care, prepared simple meals, cleaned her house and did laundry with

help from her daughter.  [AR 22].  In social functioning, the ALJ found that

Plaintiff had "moderate difficulties" due to her anxiety in crowds, which Plaintiff

said prevented her from leaving her house except to go to medical appointments

and visit her mother.  [AR 23].  The ALJ also found that Plaintiff displayed

"moderate difficulties" with regard to concentration, persistence or pace.  [AR

23].  In support, the ALJ cited a mental impairment questionnaire prepared by

Sullivan, who reported that while Plaintiff's memory was "intact," Plaintiff's

attention was "fair" and her concentration was "poor."  [AR 23].  The ALJ also

cited cognitive testing conducted by Hillibrand, a licensed clinical psychologist,

in support of his finding that Plaintiff's anxiety negatively affected her

concentration, persistence, or pace.  [AR 23].  Specifically, the ALJ stated,

"Cognitive testing results using the Wechsler Adult Intelligence Scale, Fourth

Edition in June 2015 led Dr. Hillibrand to conclude the claimant's high level of

anxiety had an overall depressing effect on many of the scales reporting all scores fell within extremely low range with a full-scale IQ of 56." [AR 23].

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR §§ 404.1567(c) and 494,967(c), except that Plaintiff could only perform simple, routine tasks, had judgment limited to simple work-related decisions, could occasionally have contact with workers but could not work in tandem or on a team with coworkers, could have occasional contact with the public, and could deal with changes in the work setting that are limited to simple, work related decisions. [AR 24]. In support of this finding, the ALJ cited psychiatric records describing Plaintiff has "well groomed and calm with an appropriate affect, normal mood and speech." [AR 25]. While recognizing that Plaintiff "experiences anxiety in social situations," the ALJ found that Plaintiff is "independent in personal care activities, performs household chores, interacts with family members, prepares simple meals, does laundry, watches television, handles her finances, and attends medical appointments." [AR 25]. The ALJ gave great weight to the opinions of Plaintiff's psychologist, except to the extent the psychologist stated in a "Medical Report for Incapacity" that Plaintiff "was unable to work since a finding of disability is an issue reserved to the Commission . . . and her opinion was not supported by any functional limitations in that report." [AR 27]. In this case, the ALJ gave "lesser weight" to conclusions about Plaintiff's residual functional capacity. The report stated that Plaintiff reported "panic attacks, poor sleep, inability to focus, high anxiety, poor concentration." [AR 412]. The report

also stated, "Client continues med management but reports severe anxiety and unstable mood. Client continues to display fear of social settings and inability to drive." [AR 412].

The ALJ also gave great weight to the opinions of Dr. Hillibrand as to the results of Plaintiff's objective cognitive and psychological testing, and "considered his observation that the claimant was anxious throughout the evaluation and that anxiety had an overall depressing effect on her cognitive testing." [AR 27]. The ALJ "reviewed and generally adopted his opinion that her attention, concentration and short-term memory were commensurate with her intellectual endowment along with his opinion that she functioned within the borderline range by incorporating limitations addressing these issues into the mental residual functional capacity." [AR 27].

At step five, the ALJ determined that Plaintiff is unable to perform and past relevant work, because her past work as a babysitter was semiskilled work performed at the medium exertional level, and Plaintiff's mental limitations in the residual functional capacity exceeded the demands of this work. [AR 27]. However, the ALJ accepted the vocational expert's testimony that Plaintiff has the ability to work at occupations such as hand packer, janitor, and laundry worker. [AR 28]. Having considered all five steps, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

## II.  Legal Standard

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an]

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1). A person must be disabled within the meaning of the Social Security Act and not any other law or regulation. A Social Security disability determination based on other laws or regulations is not dispositive of whether a person is disabled under the Social Security Act. 20 C.F.R. §§ 404.1504, 416.904. That section provides that "[a] determination made by another agency that you are disabled . . . is not binding on [the] Social Security Administration." *See also Musgrave v. Sullivan*, 966 F.2d 1371, 1375 (10th Cir. 1992) (ALJ did not err by not giving more weight to VA finding that claimant was 20% disabled). This position has been reinforced by the amendment to the regulation which now states that "on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits." 20 C.F.R. §§ 404.1504; 416.904. Thus the weight given to the opinion of an expert who is familiar with the Social Security Act program is entitled to greater weight than the opinion of an expert who is unfamiliar with the program.

In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[2] A person is disabled under the Act when their impairment is

---

[2] The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based

"of such severity that he is not only unable to do his previous work but cannot

. . . engage in any other kind of substantial gainful work which exists in the

national economy."  42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national

economy means work which exists in significant numbers either in the region

where such individual lives or in several regions of the country." *Id.*[3]

"A district court reviewing a final . . . decision [of the Commissioner of

Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§

405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842

(2d Cir. 1981).  "The findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, [are] conclusive."  42 U.S.C. § 405(g).

Accordingly, the Court may not make a de novo determination of whether a

plaintiff is disabled in reviewing a denial of disability benefits.  *Id.*; *Wagner v.

Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the

Court's function is to ascertain whether the Commissioner applied the correct

legal principles in reaching his conclusion, and whether the decision is

---

solely on the medical evidence, the claimant has an impairment listed in
Appendix 1 of the regulations. If the claimant has one of these enumerated
impairments, the Commissioner will automatically consider him disabled, without
considering vocational factors such as age, education, and work experience; (4) if
the impairment is not "listed" in the regulations, the Commissioner then asks
whether, despite the claimant's severe impairment, he or she has the residual
functional capacity to perform his or her past work; and (5) if the claimant is
unable to perform his or her past work, the Commissioner then determines
whether there is other work which the claimant could perform. The Commissioner
bears the burden of proof on this last step, while the claimant has the burden on
the first four steps. 20 C.F.R. § 416.920(a)(4)(i)—(v).

[3]  The determination of whether such work exists in the national economy is made
without regard to: 1) "whether such work exists in the immediate area in which
[the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];"
or 3) "whether [the claimant] would be hired if he applied for work."  *Id.*

supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a scintilla or touch of proof here and there in the record." Williams, 859 F.2d at 258.

## III. Discussion

Plaintiff asks the Court to reverse the decision of the Commissioner on the grounds that (1) the ALJ erred by failing to consider whether Plaintiff meets listing 12.05; (2) the ALJ erred by failing to consider Plaintiff's knee condition at step 2; and (3) the ALJ improperly gave "lesser weight" to Dr. Jakubowska's opinion that Plaintiff "would have obvious problems focusing long enough to finish assigned simple activities or tasks, performing basic work activities at a reasonable pace finishing on time, and performing work activities on a sustained basis" and her opinion that Plaintiff was unable to work.

**A. The ALJ Did Not Err by Failing to Determine that Plaintiff Does Not Meet Criteria For Listing 12.05**

Plaintiff argues first that the ALJ erred when it failed to find that Plaintiff's low scores on the Wechsler Adult Intelligence Scale qualified her as having an intellectual disability under listing 12.05. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The plaintiff bears the burden of showing that an impairment meets the specified criteria. *Id.*

"To satisfy Listing 12.05, the claimant must make a threshold showing that she suffers from 'significantly subaverage general intellectual functioning with deficits in adaptive functioning.'" *Burnette v. Colvin*, 564 F. App'x 605, 607 (2d Cir. 2014) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05); *see also Talavera v. Astrue,* 697 F.3d 145, 152–53 (2d Cir. 2012). "[P]ersonal characteristics consistent with adequate adaptive functioning, include[] the ability to navigate public transportation without assistance, engage in productive social relationships, and manage her [one's] personal finances, and the display of fluent speech, coherent and goal-directed thought processes, and appropriate affect. *Talavera*, 697 F.3d at 154. "[T]here is no necessary connection between an applicant's IQ scores and her relative adaptive functioning." *Id.* at 153.

Relying on her IQ score of 56, Plaintiff contends that her impairments satisfy Listing 12.05(B) or (C).[4] However, there is substantial evidence that

---

[4] Listing 12.05 was modified effective January 17, 2017 to eliminate subsection C. However, this change was not retroactive, so the Court must evaluate Plaintiff's

Plaintiff did not suffer from the requisite "deficits in adaptive functioning." Substantial evidence shows that Plaintiff was independent in her personal hygiene, performed household chores, managed her finances, cleaned her house, washed clothes, and cooked on a daily basis. [AR 45, 494]. There is also substantial evidence that Plaintiff was capable of managing her benefits. [AR 494]. These skills are inconsistent with Plaintiff's claim that she has deficits in adaptive functioning.

Moreover, both 12.05(B) and 12.05(C) require evidence that Plaintiff had deficits in adaptive functioning prior to age 22. Substantial evidence supports the conclusion that Plaintiff did not display deficits in adaptive functioning before the age of 22. For example, Plaintiff previously worked as a babysitter, and "taking care of children without help" is an example of adequate adaptive functioning. *See Burnette*, 564 F. App'x at 507. Because the record does not show that Plaintiff had deficits in adaptive functions—either currently or prior to the age of 22, Plaintiff's impairment does not meet the requirements of listing 12.05. The court concludes that Plaintiff has failed to show that she has an impairment that manifests "all of the specified medical criteria," *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990), of listing 12.05.

Finally, the ALJ took pains to state that he was relying on Dr. Hillbrand's evaluation throughout his decision, and that one of Dr. Hillbrand's findings was that Plaintiff's anxiety "had an overall depressing effect on her cognitive testing."

---

claims at step three "pursuant to the listings that were in effect at that time." *Rivera v. Colvin*, No. 3:15-CV-01701 (VLB), 2017 WL 1005766, at *4 (D. Conn. Mar. 15, 2017).

[AR 27].  In other words, Plaintiff's score was lower than it might otherwise have been because Plaintiff felt anxious during her evaluation.  This represents substantial evidence that Plaintiff's IQ score did not accurately reflect her intellectual abilities, and reinforces the ALJ's decision not to consider whether Plaintiff's claim fell within listing 12.05.  Therefore, Plaintiff's motion to reverse on this ground is denied.

> **B. <u>Substantial Evidence Supports a Finding That Plaintiff's Knee Injury Was Not Severe</u>**

Plaintiff next argues that the ALJ erred when he failed to consider Plaintiff's knee injury at step two.  A claimant seeking social security benefits must bear the burden of showing that he has a medically severe impairment or combination of impairments.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  "The severity regulation requires the claimant to show that he has an 'impairment or combination of impairments which significantly limits' 'the abilities and aptitudes necessary to do most jobs.'"  *Id.* at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).  It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of her condition."  *Merancy v. Astrue,* No. 3:10cv1982(WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).  A "severe" impairment is one that has lasted (or may be expected to last) for a continuous period of at least 12 months which "significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Kneeple v. Colvin*, No. 14-CV-33-JTC, 2015 WL 7431398, at *3 (W.D.N.Y. Nov. 23, 2015).

Substantial evidence supports the ALJ's conclusion that Plaintiff's knee injury was not severe.  First, Dr. Lahtinen's records show that Plaintiff had

excellent range of motion of her knee, with no difficulties with full extension and flexion, and no acute abnormality. [AR 360-367]. Substantial evidence suggests that Plaintiff's knee improved after a brief visit to physical therapy, and that while Plaintiff had difficulty running, she did not have trouble with typical daily activities. [AR 456, 460]. The Court therefore concludes that Plaintiff has failed to show that her knee injury was "severe," *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987), and, therefore, Plaintiff's motion to reverse on this ground is denied.

## C. The ALJ Gave Appropriate Weight to Medical Opinions

Plaintiff next argues that the ALJ's decision did not properly weigh medical evidence in determining Plaintiff's residual functional capacity. Specifically, Plaintiff takes issue with the ALJ's decision to give lesser weight to Sullivan's and Dr. Jacubowska's opinions in a "Mental Impairment Questionnaire" and a "Medical Report for Incapacity," in which they opined that Plaintiff would have obvious problems focusing long enough to finish assigned simple activities or tasks, performing basic work activities at a reasonable pace/finishing on time, and performing work activities on a sustained basis. [*See* AR 26]. The ALJ decided to give these opinions lesser weight because he believed that Sullivan's and Dr. Jacubowska's treatment records and the claimant's testimony and statements about her activities of daily living did not support them. [AR 26].

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"

*Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to undermine the opinion of the treating physician").

"The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) (citing *Schupp v. Barnhart*, No. Civ. 3:02CV103(WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004)). It is "within the province of the ALJ to credit portions of a treating physician's report while declining to accept other portions of the same report, where the record contained conflicting opinions on the same medical condition." *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at 4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). In determining the amount of weight to give to a medical opinion, the ALJ considers the examining relationship, the treatment relationship, the length of treatment, the nature and extent of treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors. 20 C.F.R. § 404.1527.

In this case the ALJ determined that Sullivan's and Dr. Jacubowska's conclusions about Plaintiff's residual functional capacity conflicted with

statements elsewhere in these treaters' records indicating the Plaintiff had a logical and goal oriented thought process, good insight and judgment, and intact cognitive functioning, memory, and thought processes, abstract thought, and judgment.  [AR 390, 394, 409, 436, 440, 442, 444-47, 481].  Additionally, it is the role of the Commissioner, not the treating physician, to decide whether a plaintiff is disabled.  Thus, a treating source's conclusory opinion that a plaintiff is too disabled to work is not entitled to controlling weight.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability.").

The court concludes that the ALJ's decision to not give Sullivan's and Dr. Jacubowska's report and conclusions controlling weight is supported by substantial evidence.   These conclusions are not consistent with their opinions elsewhere in the record, and those other opinions amount to "substantial evidence to undermine [their] opinions."  *Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014).  Therefore, Plaintiff's motion to reverse on this ground is denied.

## IV.   Conclusion

For the foregoing reason, Plaintiff's Motion to Reverse the Decision of the Commissioner [Dkt. No. 16] is DENIED.  The Clerk is directed to close this file.

**IT IS SO ORDERED.**

_____/s/_____

**Hon. Vanessa L. Bryant**

**United States District Judge**


**Dated at Hartford, Connecticut:  April 5, 2018**